Edgar B. Pease III, Esq.    SBN 159919
The Law Offices of Edgar B. Pease III
16255 Ventura Blvd., Ste. 704
Encino, CA 91436-2311
Email: edgarpease@gmail.com
Tel: (818) 981-2200
Facsimile: (818) 981-2201

Attorneys for Plaintiff, Will Loomis

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILL LOOMIS, an individual,<br><br>              Plaintiff,<br><br>    v.<br><br>JESSICA CORNISH, P/K/A JESSIE J, an individual; UNIVERSAL MUSIC GROUP, INC., a Delaware corporation; LAVA RECORDS LLC, a limited liability company; UNIVERSAL REPUBLIC RECORDS, business form unknown; and DOES 1-10 INCLUSIVE,<br><br>              Defendants. | Case No.  CV12-5525 RSWL (JEMx)<br><br>**DECLARATION OF EDGAR B. PEASE III IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT** |

**TO DEFENDANTS AND THEIR ATTORNEY(S) OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff, WILL LOOMIS, does hereby file the attached Declaration of Edgar B. Pease III.

**DECLARATION OF EDGAR B. PEASE III**

## DECLARATION OF EDGAR B. PEASE III

I, EDGAR B. PEASE III, declare as follows:

1.     I am the attorney of record for Plaintiff Will Loomis in this matter. This declaration is based on my personal knowledge, and if called as a witness I could and would competently testify to the matters herein.

2.     I respectfully submit this declaration on personal knowledge as to matters stated therein and in support of Plaintiff's opposition to Defendant's motion for summary judgment.

3.     Attached hereto as Exhibit "A" is a true and correct copy of the Certified copy of the Deposition of Kristin Loomis taken August 26, 2013.

4.     Attached hereto as Exhibit "B" is a true and correct copy of the Certified copy of the selected Exhibits attached to the Deposition Transcript of Kristin Loomis taken August 26, 2013.

5.     Attached hereto as Exhibit "C" is a true and correct copy of Plaintiff, Will Loomis' Expert Witness Designation FRCP 26 (2), et. sec. of Musicologist, Dr. David Stern; Written Report of Expert Dr. David Stern.

6.     Attached hereto as Exhibit "D" is a true and correct copy of the Deposition Transcript and Exhibits attached thereto (2 Volumes).

7.     Attached hereto as Exhibit "E" is a true and correct copy of the Confidential Telephonic Deposition of Jessica Cornish, taken September 10, 2013.

8.     Attached hereto as Exhibit "F" is a true and correct copy of the Continued Video Taped Deposition of William Ray Loomis taken September 3, 2013.

**DECLARATION OF EDGAR B. PEASE III**

9.    Attached hereto as Exhibit "G" is a true and correct copy of the Continued Video Taped Deposition of William Ray Loomis

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2013, at Encino, California.

_____
Edgar B. Pease III

---
3
**DECLARATION OF EDGAR B. PEASE III**

# Exhibit "A"

Page 1

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4  WILL LOOMIS, an individual, )     **CERTIFIED COPY**

                           )

5          Plaintiff,    )

                           )

6         VS.        )  No. CIV12-5525

                           )

7  JESSICA CORNISH, P/K/A  )

  JESSIE J, an individual; )

8  UNIVERSAL MUSIC GROUP, Inc., )

  a Delaware Corporation; LAVA )

9  RECORDS, LLC, A limited  )

  liability company; UNIVERSAL )

10 REPUBLIC RECORDS, Business )

  form unknown; DOES 1-10, )

11 inclusive,        )

                           )

12        Defendants.  )

  _____)

13

14

15

16       DEPOSITION OF KRISTIN LOOMIS

17         Los Angeles, California

18        Monday, August 26, 2013

19

20

21

22

23 Job No: 65230

24 Reported by: NIKKI ROY

25 CSR No. 3052

Page 2

1           Deposition of KRISTIN LOOMIS, taken before NIKKI
2      ROY, CSR No. 3052, a Certified Shorthand Reporter for
3      the State of California, commencing at 10:00 A.M., on
4      Monday, August 26, 2013, at 11377 West Olympic
5      Boulevard, Los Angeles, California on behalf of the
6      Defendants.
7
8
9      APPEARANCES OF COUNSEL:
10
11     FOR THE PLAINTIFF:
12          LAW OFFICES OF EDGAR B. PEASE III
            BY:  EDGAR B. PEASE III, Attorney at Law
13          16255 Ventura Boulevard
            Encino, California 91436
14
15
16
17     FOR THE DEFENDANTS:
18          MITCHELL SILBERBERG & KNUPP
            BY:  JEFFREY M. MOVIT, Attorney at Law
19          12 East 49th Street
            New York, New York 10017
20
21
22
23     ALSO PRESENT:
24          BRENT JORDAN, videographer
25

Exhibit  14      Jerome  Promotions  Radio  Report
                    Page.145;

Exhibit  15      Jerome  Promotion  Radio  Report
                    iradio LA, page.149;

Exhibit  16      Jerome  Promotion  Radio  Report
                    KFMI-FM, page 149;

Exhibit  17      Jerome  Promotion  Radio  Report
                    KLBQ-FIM, page 150;

Exhibit 18       Jerome  Promotion  Radio  Report
                    KQAD-AM, page. 150;

Exhibit  19      Jerome  Promotion  Radio  Report
                    KQCR-FM, page. 150;

Exhibit 20       LexPop Jerome  Promotion  Radio
                    Report, page. 151;

Exhibit 21       WELT-FM Jerome  Promotion  Radio
                    Report, page. 151;

Exhibit 22       WMOA-AM Jerome  Promotion  Radio
                    Report, page. 151;

Exhibit 23       WMQT-FM Jerome  Promotions,  Inc.
                    Spins Tracking System document,
                    Page. 151;

Exhibit 24       Spins Tracking System document
                    sent July 27,2010, page. 152;

Exhibit 25       E-mail  chain,  page 156;

Exhibit 26     E-mail chain, page. 176;

Exhibit 27     TapScan ReachMaster Schedule
Analysis, page. 181;

Exhibit 28     E-mail chain, page. 183;

Exhibit 29     E-mail chain, page. 202;

Exhibit 30     E-mail chain, page. 202;

Exhibit 31     E-mail chain, page. 202;

Exhibit 32     E-mail chain, page. 203;
Exhibit 34     E-mail chain, page. 223;

Exhibit 35     E-mail chain, page. 226;

Exhibit 37     E-mail chain, page. 241;
Exhibit 38     E-mail chain, page. 248;

Exhibit 41     E-mail chain, page. 288;

Exhibit 42     Income and expense reports for
Kings of Spain for the years
2008 through 2010 (Retained)
2008 through 2010 (Retained)

Page 12

1      And, again, this is just to make sure that

2   there's no problems with your memory as far as the

3   testimony, you're not on any medication that

4   interferes with your memory in any way?

5      A.   No.

6      Q.   Okay.  And you understand that you're

7   testifying under oath today of course?

8      A.   Of course.

9      Q.   Okay.  Just for the record, can you please

10  give your address of residence?

11     A.   Yes.  It's 285 San Ysidro Road,

12  Santa Barbara, California.

13     Q.   And are you currently employed?

14     A.   I work non -- full time at HHV6 Foundation.

15  I'm the executive director.

16     Q.   And can you please briefly explain what the

17  HHV6 Foundation is?

18     A.   It's a scientific medical foundation.  We

19  support research into a specific beta herpes virus

20  and the disease associations.  We give medical

21  conferences, initiate collaborations and manage a

22  repository of research reagents.

23     Q.   And how long -- what are your main job

24  responsibilities as executive director?

25     A.   Well, I oversee the foundation, do

Page 13

1    fundraising, manage the conference, manage the

2    repository, manage the newsletter, manage the

3    website.

4         Q.    And how long have you been executive

5    director?

6         A.    Since 2004.

7         Q.    Okay.  Is this a full-time job?

8         A.    No, it's more than -- it's more like 60

9    hours a week.

10        Q.    Do you -- is it fair to say that you do

11   not -- do you have any other employment currently

12   besides being executive director of the HHV6

13   Foundation?

14        A.    No.

15        Q.    Okay.  Okay.  Did you have any role in this

16   foundation prior to becoming an executive director?

17        A.    No, I founded it.  I cofounded it.

18        Q.    Okay.  And what, if anything, was your

19   employment prior to being the executive director of

20   this foundation?

21        A.    I worked in publishing.

22        Q.    And what was your job in publishing prior to

23   the HHV6 Foundation?

24        A.    Well, let's see.  I was -- I also did

25   acquisitions.  I was circulation director of Esquire

Page 14

1    Magazine.  I worked in circulation at Time Magazine.

2    I was a vice president for acquisitions at Whitney

3    Communications.  I did consulting for International

4    Herald Tribune and Time International.

5         Q.   Let's go back to your education for a

6    moment.  Are you a college graduate?

7         A.   I am.

8         Q.   Okay.  And where did you graduate from

9    college?

10        A.   Wellesley.

11        Q.   Okay.  And what year was that?

12        A.   '75.

13        Q.   Okay.  After that did you begin working or

14   did you have more school?

15        A.   I went to Harvard Business School.

16        Q.   That's directly after Wellesley?

17        A.   Uh-huh.

18        Q.   Okay.  And what year did you graduate

19   Harvard Business School?

20        A.   '77.

21        Q.   Okay.  And what did you do after graduating

22   Harvard Business School?

23        A.   I went to Time International.

24             MR. PEASE:  Excuse me.  Wait till he -- wait

25   till he finishes, and you did say "uh-huh" one time.

Page 15

1    So I want to remind you to --

2              THE WITNESS:  Okay.

3              MR. PEASE:  -- use yes or no.  And speak up

4    just a little bit, make sure the court reporter hears

5    you.

6              THE WITNESS:  Okay.

7    BY MR. MOVIT:

8         Q.   Okay.  And what did you do at Time

9    International after graduating from Harvard Business

10   School?

11        A.   I worked for Fortune in circulation and

12   promotion.

13        Q.   Okay.

14             THE DEPOSITION OFFICER:  I'm sorry.  I

15   worked for --

16             THE WITNESS:  Fortune Magazine in

17   circulation and promotion.

18   BY MR. MOVIT:

19        Q.   In circulation and promotion.  How long did

20   you have that job?

21        A.   Less than two years.

22        Q.   Okay.  What was your next job after that?

23        A.   Esquire Magazine.

24        Q.   Okay.  And what was that beginning?

25        A.   Late '70s.

Page 16

1      Q.   Okay.   And what was your title at Esquire

2   Magazine at that point?

3      A.   Circulation manager.

4      Q.   Okay.   How long did you have that job?

5      A.   Less than two years.

6      Q.   Okay.   And what was your next job after

7   that?

8      A.   I did a start-up venture with Clay Felker.

9      Q.   Could you spell Clay Felker, please.

10     A.   C-l-a-y.

11     Q.   Uh-huh.

12     A.   F-e-l-k-e-r.

13     Q.   Is that a person?

14     A.   Uh-huh.   He's a famous journalist.

15     Q.   Okay.   And what was this venture?

16     A.   We were trying to start up a city newspaper,

17   to compete with New York Magazine.

18     Q.   So this was in the city of New York?

19     A.   Uh-huh.

20     Q.   Okay.   And when did this venture begin?

21     A.   Late '70s, early '80s.

22     Q.   And how long were you involved with this

23   venture?

24     A.   Less than two years.

25     Q.   Okay.   Was the venture successful?

Page 17

1    A.    No.

2    Q.    Okay.   What was your next job?

3    A.    I worked at Whitney Communications.

4    Q.    Okay.   At Whitney Communications?

5    A.    Whitney.

6    Q.    Okay.   I would echo Mr. Pease's request that

7    you please speak up a little.   Thank you.

8          And what did you do at Whitney

9    Communications?

10   A.    I did acquisitions of small cable companies.

11   Q.    And do you remember your title?

12   A.    I was a vice president.

13   Q.    Okay.   And how long were you vice

14   president -- I'm sorry.   Strike that.

15         What years were you, if you recall, vice

16   president at Whitney?

17   A.    I don't recall exactly.

18   Q.    Approximately?

19   A.    Late '70s, early '80s.

20   Q.    Okay.   And what was your next job after

21   that?

22   A.    I'm thinking.   I moved to Hong Kong and I

23   worked for the International Herald Tribune and Time

24   International.

25   Q.    Okay.   And when did this begin?

Page 18

1      A.    Early '80s.

2      Q.    Okay.  Were you simultaneously working for

3   the International Herald Tribune and Time

4   International?

5      A.    Yes.

6      Q.    Okay.  And what was your title?

7      A.    Consultant.

8      Q.    Okay.  Did they have the same corporate

9   owner at that point?

10     A.    No.

11     Q.    Okay.  So you were doing consulting work for

12  two separate clients, then?

13     A.    Uh-huh.

14     Q.    Okay.  So you were an independent

15  consultant?

16     A.    Uh-huh.

17     Q.    Okay.  And do you remember the approximate

18  years in which you were an independent consultant for

19  the IHT and Time International?

20     A.    Early '80s.

21     Q.    Okay.  Do you remember how many years you

22  were an independent consultant for these two clients?

23     A.    About two years.

24     Q.    Okay.  What was your next job after that?

25     A.    I think I took a break after my -- I think I

Page 19

1    took a break for a few years because of new children,

2    and then worked for Compu-Card International.

3        Q.   Is that Copy Card?

4        A.   Compu-Card.

5        Q.   Okay.  Could you please spell that.

6        A.   I think that they shortened it to CUC.  When

7    I started it was Compu-Card International and then it

8    became CUC International.

9        Q.   Okay.  Could you please -- do you recall how

10   Compu-Card is spelled?

11       A.   C-o-m-p-u-c-a-r-d.

12       Q.   Okay.  Is the C in card capitalized?

13       A.   Yes.

14       Q.   Is that one word or two, Compu-Card?

15       A.   I think they had hyphens.

16       Q.   Okay.  And do you recall the approximate

17   years in which you worked for Compu-Card

18   International or CUC?

19       A.   Mid 80s.

20       Q.   Okay.  How many years approximately?

21       A.   Two.

22       Q.   Okay.  Did you have a title there?

23       A.   I was vice president.

24       Q.   Okay.  Did you have any other title there?

25       A.   Not that I recall.

Page 47

1          Q.    When approximately was it originated,

2     Ms. Loomis, the account?

3          A.    I believe it was 2006.

4          Q.    Okay.  And your son Will took over operating

5     that account when you resigned?

6          A.    Uh-huh.

7          Q.    "Yes"?

8          A.    Yes.

9          Q.    Yes, okay.  Okay.  When approximately in

10    2010 did you cease being involved in your words as a

11    volunteer with the band?

12         A.    I can't recall exactly, but sometime between

13    October and November.

14         Q.    Of 2010?

15         A.    Uh-huh.

16         Q.    Okay.  When did you begin being involved

17    with the band?

18         A.    When he was in third grade.

19         Q.    When -- do you know when Loomis & the Lust

20    was founded?

21         A.    I think the original band name was Kings of

22    Spain.  Well, he had a few names, but Kings of Spain

23    was briefly the name of the band.  I think that was

24    in 2006.  And then I think Loomis & the Lust was the

25    new name beginning possibly in 2007, but I can't

Page 48

1    recall exactly, but probably 2007.

2            MR. PEASE:  Objection as to the scope.  This

3    is Kings of Spain.  Are you incorporating --

4    Christine Loomis -- these are questions for

5    Christine -- or Kristin Loomis, her deposition into

6    these questions, and then I won't have to ask for

7    this objection to scope going back to the third grade

8    because she's here as -- representing of 30(b)(6) of

9    Kings of Spain.

10           MR. MOVIT:  I -- I'm going to -- let's move

11   on, please, or it's going to be a very long day.

12   Your objection, to the extent there was one in there,

13   is noted.  Let's move on.

14           30(b) -- okay.  So it's very clear, a

15   30(b)(6) witness can be testifying -- you know, can

16   testify as to personal knowledge and the knowledge of

17   the organization for whom the witness is testifying

18   on behalf of.

19           MR. PEASE:  I'm aware of that.

20           MR. MOVIT:  So I'm going to proceed on that

21   basis.

22           MR. PEASE:  I'm aware of that.

23   BY MR. MOVIT:

24       Q.   Okay.  What were your -- what was your role

25   as a volunteer for Loomis & the Lust?

Page 49

1        A.    I assisted them with administrative matters
2    and tried to keep them organized.  I helped them set
3    up their websites.  I insisted that they keep
4    financial records, and that we set up a corporate
5    entity and that all income and expenses were run
6    through that, and that we filed tax returns.
7             I also arranged insurance for their band bus
8    and did what I could to help because they were
9    focused on music and did need some administrative
10   support, which I was able to offer.
11        Q.    Okay.  And the corporate entity that you
12   referred to in your answer, was that Kings of Spain,
13   Incorporated?
14        A.    Yes.  We set it up originally, I think,
15   because it was the first band name, and then we kept
16   that entity as the -- kind of the operating entity
17   and Loomis & the Lust became the band.  But we -- we
18   kept the Kings of Spain, we had a checking account,
19   we -- I think we trademarked the name and set it up
20   as a corporation.
21             MR. MOVIT:  I'd like to next mark exhibit --
22   are we up to 3 -- Exhibit 3.
23             (The document referred to was marked
24             by the CSR as Deposition Exhibit 3 for
25             identification and attached to the

Page 70

1      A.   No.  But we've sent things to Rodney Jerkins

2  who was his associate.

3      Q.   Okay.  Step back.  So let's first -- let's

4  break this down.  First of all, I'm asking if it's

5  correct that you never sent anything directly to

6  Mr. Claude Kelly.  Then we'll talk about indirectly.

7  But directly, is it correct, that you've never sent

8  anything directly to Mr. Claude Kelly?

9      A.   Not directly but, yes, indirectly.

10     Q.   Okay.  Indirectly.  Is it your contention

11  that you have sent anything indirectly to Mr. Claude

12  Kelly?

13     A.   Yes.  Indirectly through his associate

14  Rodney Jerkins.

15     Q.   Okay.  What do you contend that you -- well,

16  first of all, what did -- strike that.

17         What do you contend that you sent to

18  Mr. Jerkins?

19     A.   Bright Red Chords.

20     Q.   Okay.  When did you send Bright Red Chords

21  to Mr. Jerkins?

22     A.   At the New Music Festival.

23     Q.   Okay.  What is the New Music Festival?

24     A.   It was a contest for emerging artists and --

25  with a $25,000 price and they won it -- Loomis & the

Page 71

1    Lust won it, and Rodney was the -- Rodney was the --

2    was one of four judges, and he received Bright Red

3    Chords in advance, and he watched the production of

4    Bright Red Chords, and in fact expressed a lot of

5    enthusiasm about it in the ensuing discussion.

6         Q.    When was this New Music Festival?

7         A.    I'd have to get back to you with the exact

8    date, but I think it was -- well, it was 2009 or

9    2010.

10        Q.    Okay.  And is it your contention that

11   Mr. Jerkins was physically provided with a copy of

12   Bright Red Chords?

13        A.    Yes.

14        Q.    Okay.  How do you know that?

15        A.    Because the New Music Festival sent it to

16   each of the judges, and I know that because I

17   coordinated with them.  And he also sat in the room

18   and listened to it, and I have a videotape of him

19   sitting in there with 800 people watching the Bright

20   Red Chords on the video and then praising it.

21        Q.    Okay.  And we're not speaking about

22   listening to the song right now.  We're speaking

23   about physically being provided --

24        A.    Uh-huh.

25        Q.    -- with a copy of it.

1      A.   He was.

2      Q.   Okay.

3      A.   He received a digital copy.

4      Q.   How do you know he received a digital copy?

5      A.   Because the leader, the manager of the New

6  Musical Seminar sent it to all four judges in

7  advance.

8      Q.   How do you know the manager sent it?

9      A.   Because I was informed of it.  I may have

10  even been copied on the e-mail.

11      Q.   Okay.  You have not produced any such

12  e-mail --

13      A.   I don't have access --

14      Q.   -- have you?

15      A.   -- to that account anymore, but I assume,

16  you know, it could be dug up.

17      Q.   I'll represent that no such e-mail has been

18  produced.

19      A.   Well, wait.  How do you know it hasn't been?

20  I suspect it probably has.

21      Q.   Because I've reviewed all 3,000 pages of

22  your production.

23      A.   You have?

24      Q.   Yes, I have.  Yes, ma'am.

25      A.   Okay.  Well, I don't know that this fell

Page 329

```
 1    BY MR. MOVIT:
 2         Q.   Ms. Loomis, is it your testimony that the
 3    video we just watched -- strike that.
 4              Ms. Loomis, do you know who created -- who
 5    was the videographer for the video we just watched?
 6         A.   I was.
 7         Q.   Do you know who edited the video?
 8         A.   Will did that edit.  I probably have the
 9    full tape.
10         Q.   Not sure one way or the other?
11         A.   I believe it's on my hard drive.
12         Q.   But you haven't looked for it in responding
13    to the document request in this case; is that true?
14         A.   No, because it didn't occur to me that it
15    would be relevant.
16         Q.   Do you know who posted it on YouTube?
17         A.   I assume Will did.
18         Q.   Okay.  But you're not for sure for sure?
19         A.   No.
20         Q.   Okay.  Is it your testimony that the video
21    shows Rodney Jerkins at any point?
22         A.   I'm 100 percent certain that that was Rodney
23    Jerkins on the panel, and that can be easily
24    verified.  He was introduced.  He was on all the
25    literature.  He was in Billboard magazine as a
```

Page 330

1    panelist.  So, yes, that was Rodney Jerkins.

2         Q.   Do you recall if Rodney Jerkins was not

3    present for any portion of the events set forth in

4    that video?

5         A.   He was there the entire time when -- when

6    the music was -- by Loomis -- was played by Loomis &

7    the Lust, and he was there at the end.

8              MR. MOVIT:  Okay.  I'll just state for the

9    record that large portions of the dialogue on the

10   video were incomprehensible to my ears.  Because I

11   know that we weren't doing a transcription of it, I

12   will say for the record that large portions of the

13   dialogue I could not discern.

14             I'll just make a statement that I am done

15   with asking questions for the day because of the

16   issues with potentially incomplete document

17   production.  I, as a legal matter, as a technical

18   matter, am holding the deposition open.

19             I understand that the witness is going to

20   Europe for the rest of the period of discovery in

21   this case, so obviously that creates issues, but all

22   rights reserved.

23             And with that, to the extent that you're not

24   asking any questions today, Ed, I think we're done

25   for the day.

EXHIBIT "B"

# EXHIBIT "14"

JEROME PROMOSTIONS RADIO REPORT

7/27/10 – 10/26/10

## Jerome Promotions Radio Report
## 2535 Winthrope Way
## Lawrenceville, GA 30044
## 770-982-7055
## hitcd@bellsouth.net

*Loomis and the Lust  / "Bright Red Chords" / Kings of Spain Records*
*071910*

July 27, 2010

### New Adds
KFMI / Eureka, CA
KGY / Olympia, WA
KLBQ / Eldorado, AR
KQCR / Hampton, IA
WIDE / Troy, NY Top 40 Internet
WJER / Dover, OH



Exhibit 14

K. Loomis
8/26/13
reporter: Nikki Roy
CSR No. 3052

**LOOMIS 001762**

# Jerome Promotions Radio Report
## 2535 Winthrope Way
## Lawrenceville, GA 30044
## 770-982-7055
## hitcd@bellsouth.net

***Loomis and the Lust  / "Bright Red Chords" / Kings of Spain Records***
*071910*

September 28, 2010

### New Adds
KBHI / Cape Girardeau, MO
WYUL / Burlington, VT

| Airplay | Spins |
|---|---|
| FM102 Internet / San Francisco, CA | 7 |
| I-Radio LA / Covina, CA Internet | 90 stress trax |
| KCAJ / Roseau, MN | 21 stress trax (getting good response) |
| KCHE FM / Cherokee, IA – stress trax | 8 |
| KFMI / Eureka, CA | 14 stress trax |
| KGY / Olympia, WA | 24 |
| KIQX / Durango, CO | 7 |
| KIXY / San Angelo, TX  **R&R Reporter | 25 |
| KKRB / Klamath Falls, OR | 20 |
| KLBQ / Eldorado, AR  **R&R Reporter | 45 stress trax |
| KQAD / Luverne, MN | drop, no response |
| KQCR / Hampton, IA | 28 not much response |
| KREZ / Cape Girardeau, MO | 9 |
| KTRL / Stephenville, TX | 8 |
| KTRN / Pine Bluff, AR | 5 no response |
| KUOO / Spirit Lake, IA | 8 |
| KURT / Stephenville, TX | 8 |
| KYFM / Bartlesville, OK | 25 |
| KZEW / Wheatland, WY | 5 |

**LOOMIS 001767**

| | |
|---|---|
| Lexpop / Lexington, KY | 37 |
| WELT / Swainsboro, GA | 28 |
| WGTA / Thomaston, GA | 21 |
| WIDE / Troy, NY Top 40 Internet | 95 |
| WJER / Dover, OH | 20 |
| WJTW / Marietta, OH | 10 |
| WKIB / Cape Girardeau, MO | 9 |
| WMOA / Marietta, OH | 10 stress trax |
| WMQT / Marquette, MI | 21 |
| WOCO / Oconto, WI | 11 |
| WREZ / Paducah, KY | 9 |

LOOMIS 001768

# Jerome Promotions Radio Report
## 2535 Winthrope Way
## Lawrenceville, GA 30044
## 770-982-7055
## hitcd@bellsouth.net

*Loomis and the Lust / "Bright Red Chords" / Kings of Spain Records*
*071910*

October 12, 2010

## New Adds
None

| Airplay | Spins |
|---|---|
| FM102 Internet / San Francisco, CA | 7 |
| I-Radio LA / Covina, CA Internet | 99 stress trax |
| KBHI / Cape Girardeau, MO | 8 |
| KCAJ / Roseau, MN | 21 stress trax (getting good response) |
| KCHE FM / Cherokee, IA – stress trax | drop, no response |
| KFMI / Eureka, CA | 14 stress trax |
| KGY / Olympia, WA | 24 not much response |
| KIQX / Durango, CO | 5 no response |
| KIXY / San Angelo, TX  **R&R Reporter | 25 no response |
| KKRB / Klamath Falls, OR | 20 |
| KLBQ / Eldorado, AR  **R&R Reporter | 45 stress trax  #1 |
| KQCR / Hampton, IA | drop, not enough response |
| KREZ / Cape Girardeau, MO | 9 |
| KTRL / Stephenville, TX | 8 |
| KUOO / Spirit Lake, IA | 8 |
| KURT / Stephenville, TX | 8 |
| KYFM / Bartlesville, OK | 16 no response |
| KZEW / Wheatland, WY | 5 |
| Lexpop / Lexington, KY | 37 |
| WELT / Swainsboro, GA | drop, no response |
| WGTA / Thomaston, GA | 21 |

**LOOMIS 001765**

| | |
|---|---|
| WIDE / Troy, NY Top 40 Internet | 90 |
| WJER / Dover, OH | 20 |
| WJTW / Marietta, OH | 10 |
| WKIB / Cape Girardeau, MO | 9 |
| WMOA / Marietta, OH | 10 no response |
| WMQT / Marquette, MI | 22 no response |
| WOCO / Oconto, WI | 11 |
| WREZ / Paducah, KY | 9 |
| WYUL / Burlington, VT | 17 |

LOOMIS 001766