EXHIBIT "F"

EXHIBIT F

## Bright Red Chords - Domino, Comparison of Drums at Starts of Verses
### by Dr. David Stern, Ph.D. in Music Theory

I noticed a similarity in the use of drum breaks in both songs. In order to compare the drum breaks at the start of each verse, I did a transcription which includes the opening lines of each verse for both songs, and the basic drum patterns for these same passages.

For the following description, please refer to Exhibit G for the musical examples.

Verse 1

"Bright Red Chords:"  The drum drops out for the start of verse 1 in bar 10, with no drums until the steady beat at bar 11 which starts at the final word of verse 1's initial melodic line.

"Domino:" This pattern is mostly intact for Domino's first verse, bars 4-5. The difference here is that there is no drumbeat prior to bar 5, because it is near the start of the song and the drums have not yet come in altogether. However, the rest of the pattern, no drums to accompany the initial vocal line, and steady drumbeat starting at the last word of that initial melodic line in the following measure (bar 5), is there.

Verse 2

The drumbeat drops out for the opening line of verse 2 for both songs (compare Bright Red Chords, bars 31-32 and Domino, bars 39-40). Again, in both songs the steady drumbeat resumes in the corresponding place, at the last word of the text line.

The absence of drums to highlight the starts of verses and the use of a steady drumbeat starting at the last word of the initial melodic line for each verse creates an effect that is similar in both songs. This effect is heightened by the fact that the melodic material in the first bar of each verse (the part without the drumbeat going) consists of the same scale degrees within their respective keys and essentially  the same rhythms in both songs.

1

EXHIBIT "G"



Exhibit G
Comparison of Drum Usage at start of verses in
Bright Red Chords and Domino (given in D major)

Domino has been transposed to D major for ease of comparison

EXHIBIT "H"

EXHIBIT H
Comparison of the Verse Melodies to "Bright Red Chords",
"Domino", and "Rush"
by Dr. David Stern, Ph.D. in Music Theory

I was hired by Will Loomis in 2012 to do expert analytical assessment, transcribing and comparing the songs "Bright Red Chords" recorded by Loomis and the Lust and "Domino" recorded by Jessie J. I was subsequently asked to assess the relation between these songs and "Rush" recorded by Big Audio Dynamite, having been told that the legal defense team was claiming that "Bright Red Chords" sounds like the earlier song "Rush." I understand that "Rush" was introduced to demonstrate the presumption that the melodic material shared by "Bright Red Chords" and "Domino" is commonplace and not strongly distinguished, also appearing in the earlier song "Rush." Despite similarities, there are significant differences in the verse melodies of "Bright Red Chords" and "Rush."

My analytical conclusions concerning these three songs follow here.

For the following analysis, please see Exhibit I where I have placed all three songs in chronological order and provided a comparative musical analysis.

Note on labels: In Exhibit I, melodic figures are labelled with letters. If the labels are the same, the figures are related. Often the figures are varied, so A1 means a variation of A, A2 a different variation of A, et cetera. I labeled the opening melodic figure of Rush "A" to distinguish it from the other forms of melodic figure A found at the start of the other songs. I have retained the same labeling that I used for specific instances of figures A and B for the first verse of "Bright Red Chords" and "Domino" in my analysis from Exhibit D, including the phrase "end of B"or "end of B varied" to keep the terminology consistent. In Exhibit I, the use the letter C indicates the presence of the same melodic figure at the very end of verse 1 in "Bright Red Chords" and "Rush."

The first verse for each song has four distinct melodic lines consisting of two bars each (altogether forming a standard-length 8 bar verse).

The first melodic line of "Bright Red Chords" has some notes and rhythms in common with the first melodic line of "Rush" (labelled "A"), but starts on a different note and with a faster melodic rhythm (two eighth notes b-d1) than the opening melodic note of "Rush" (one quarter note d1). In my opinion this makes the melodic opening "Bright Red Chords" more distinctive and catchy than the opening line of "Rush." It is a real difference, and the ending of the first line for "Bright Red Chords" has an embellishment f#1-e1-f#1 not in "Rush."

The melodic settings for verse one text lines 2 and 4 are distinctly different in "Bright Red Chords" from the melodic settings of text lines 2 and 4 in "Rush," although they end with the same notes on the final word; this constitutes more of a structural connection than the actual use of another song's melody. The melodic setting of text line three in

1

Rush (at "and not change a single thing) sounds like a variant of the opening melodic idea of "Rush," but it is rather loosely varied and so where there could have been a strong parallel with the third line of "Bright Red Chords" (at "I watch the record spin around) there is instead a distinctly different melodic idea.

Despite the similarities in the compared compositions noted with parts of melodic figures found in common to both songs and both songs ending each text line setting with the same notes (creating a structural parallel between the songs), none of the four verse lines from "Rush" are found to be duplicated exactly in "Bright Red Chords." The use of melodic figures is looser in "Rush" than in the other songs. This can be seen in Exhibit I where none of the first verse melodic figures of Rush are repeated without variation, whereas in the other two songs the opening melodic figures return for their third text line setting.

My opinion on the relationship between the first verse melodies of "Rush" and "Bright Red Chords" is that on the one hand there are some similarities in melody and musical structure. The melody of "Bright Red Chords" at times verges on being just like that of "Rush" but diverges sufficiently to remain similar but still independent from Rush. My listening to subsequent verses of "Rush" does not alter my opinion on this, although I have only presented a detailed comparison of verse 1; I did not find that later verses were generally closer to the melodic substance of "Bright Red Chords" than the first verse.

### Analytical Conclusions of the First Verse Melodies of "Rush," "Bright Red Chords" and "Domino."

The melodic material of the verse to "Domino" is closer musically to "Bright Red Chords" than to the melodic lines to the verse of "Rush". This is because both "Bright Red Chords" and "Domino" start with the more distinctive version of A starting with eighth note rest followed by three eighth notes (b-d1-b seen at the start of Exhibit I) as opposed to the opening of "Rush" starting with quarter note d1. This opening is unique to "Bright Red Chords," not found in "Rush," and is this divergence from the opening of "Rush" that is repeatedly used to begin text lines of both verses of "Domino."

Interestingly, examining "Rush" affords the opportunity (because of its looseness in treatment of melodic ideas) to highlight the fact that in comparison, the various uses of melodic idea "A" in both "Bright Red Chords" and "Domino" is more distinct and well-defined as a specific idea to be repeated; even the variants in those two later songs tend to be less far-ranging than those heard in "Rush."

It is my opinion that the verses of "Domino" rely very heavily on a melody that had earlier been used in "Bright Red Chords," that is very catchy and distinct, and that is the same melody with some minor embellishments or variants. It is my opinion that there is a substantial similarity between these two songs.

2

EXHIBIT "I"

Exhibit I
First Verse Comparison of Bright Red Chords, Domino, and Rush
(all songs given in D major for ease of comparison)





EXHIBIT "D"

Page 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                                    **CERTIFIED COPY**

4    WILL LOOMIS, an individual,      )
                                      )
5              Plaintiff,             )
                                      )
6         vs.                         )    No. CIV12-5525
                                      )    Pages 1 - 94
7    JESSICA CORNISH, P/K/A JESSIE J, )
     an individual; UNIVERSAL MUSIC   )
8    GROUP, INC., a Delaware          )
     Corporation; LAVA RECORDS, LLC, A)
9    limited liability company;       )
     UNIVERSAL REPUBLIC RECORDS,      )
10   Business form unknown; DOES 1-10,)
     inclusive,                       )
11                                    )
                   Defendants.        )
12   _____)

13

14

15        VIDEOTAPED DEPOSITION OF DAVID STERN, Ph.D.

16              LOS ANGELES, CALIFORNIA

17            FRIDAY, SEPTEMBER 13, 2013

18

19

20

21

22

23   REPORTED BY:

24   LESLIE L. WHITE, CSR NO. 4148

25   JOB NO.:  65877

Page 2

1

2

3

4                    Friday, September 13, 2013

5                         1:12 p.m.

6

7

8           Videotaped deposition of DAVID

9     STERN, Ph.D., held at 11377 West Olympic

10    Boulevard, Suite 700, Los Angeles,

11    California, before Leslie L. White, CSR

12    No. 4148.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1      A P P E A R A N C E S:

2

3      LAW OFFICES OF EDGAR B. PEASE III

4      Attorneys for Plaintiff

5         16255 Ventura Boulevard

6         Encino, California 91436

7      BY:  EDGAR PEASE III, ESQ.

8

9

10     MITCHELL SILBERBERG & KNUPP

11     Attorneys for Defendants

12        12 East 49th Street

13        New York, New York 10017

14     BY:  JEFFREY MOVIT, ESQ.

15     (PRESENT THROUGH VIDEO CONFERENCE)

16

17   ALSO PRESENT:

18     MICHAEL MULLIN, Videographer

19     KIM JACKSON

20     WILL LOOMIS

21

22

23

24

25

Page 4

I N D E X

WITNESS:                 EXAMINATION              PAGE
DAVID STERN, Ph.D.       BY MR. MOVIT             6




E X H I B I T S

DEFENDANTS'                                       PAGE
Exhibit 43        Plaintiff Will Loomis' Expert     8
                  Witness Designation

Exhibit 44        Exhibit D of Dr. Stern           11

Exhibit 45        Document starting with           22
                  Figure 1:  Pickup bar, Figure
                  1:  Second bar notes

Exhibit 46        Exhibit I of Dr. Stern           68

Exhibit 47        Document starting with           71
                  Figure 1:  Pickup bar, Figure
                  1:  Second bar notes

Exhibit 48        CD labeled Ferrara Audio         81
                  Exhibit 1

Exhibit 49        Defendants' Expert Disclosures   85
                  Pursuant to Rule 26(A)(2)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
(NONE)

REQUESTED TO BE MARKED
PAGE/LINE
42/2
59/25

1    LOS ANGELES, CALIFORNIA; FRIDAY, SEPTEMBER 13, 2013

2                    1:12 p.m.

3                    -o0o-

4        THE VIDEOGRAPHER:  We are now on the video

5    record.  The following is the videotaped deposition

6    of David Stern, Ph.D. in the matter of Loomis

7    vs. Cornish.

8            This case is filed in the United States

9    District Court for the Central District of

10   California, Case No. CIV-125525.

11           This deposition is being held at Mitchell

12   Silberberg & Knupp, 11377 West Olympic Boulevard in

13   Los Angeles, California, Suite 600.

14           Today's date is Friday, September 13th,

15   2013.  The time is now approximately 1:12 p.m.

16           My name's Michael Mullin from TSG

17   Reporting, and I'm the legal video specialist.  The

18   court reporter is Leslie White.

19           Will all counsel introduce themselves for

20   the video record, please.

21   BY MR. MOVIT:

22       Q    Good afternoon, Dr. Stern.  My name is

23   Jeff Movit.  I'm with the Law Firm of Mitchell

24   Silberberg & Knupp, and I am counsel for defendants

25   in this action.

Page 6

1         And with me is Dr. Lawrence Ferrara.

2      MR. PEASE:   Good afternoon --

3      THE WITNESS:   Good afternoon --

4      MR. PEASE:   Good afternoon.   My name is Ed

5   Pease, P-e-a-s-e.   I'm representing Will Loomis,

6   plaintiff in this action, who is present seated at

7   this conference table.

8         And also to my right is Dr. David Stern,

9   Ph.D., the deponent.

10      THE VIDEOGRAPHER:   Will the court reporter

11   please swear in the witness.

12

13               DAVID STERN, Ph.D.,

14         the witness herein, having been

15         first duly sworn, was examined

16         and testified as follows:

17

18               EXAMINATION

19   BY MR. MOVIT:

20      Q    Dr. Stern, have you ever been deposed

21   before?

22      A    This is my first time.

23      Q    Okay.   So why don't I give you the ground

24   rules for a deposition.

25         I'm going to ask questions, to the extent

Page 7

1    that there is an objection to the form of the

2    question, Mr. Pease will make that, and then you're

3    required to answer the question after that.

4           Please answer questions with words and not

5    with gestures.  Although this is being videotaped,

6    we want to make sure we have a clear record, and the

7    court reporter has difficulty taking down shrugs and

8    nods.

9           So please answer with a "yes" or a "no,"

10   as opposed to a shrug or a nod.  Similarly, please

11   don't answer questions with "uh-huh" or "un-huh."

12   Those are, again, very hard for the court reporter

13   to transcribe accurately.

14          Dr. Stern, is there any reason that you

15   can't testify today to the best of your ability?

16      A    No.  There is one thing I want to bring

17   up, though.  And that is that I am recovering from

18   emergency eye surgery four weeks ago, and so I may

19   just ask occasionally for a little break to regather

20   my energy, but I think I'll be overall fine.

21      Q    That's fine, when a question is not

22   pending.  That's fine.

23      A    Okay.

24      Q    Do you have any problems with your memory

25   at all?

1      A    No.

2      MR. MOVIT:  All right.  Kim, can you please

3  take out the document that I sent you yesterday for

4  marking that is labeled, "Plaintiff Will Loomis'

5  Expert Witness Designation."

6      MS. JACKSON:  Yep.

7      MR. MOVIT:  This will be Exhibit 43.

8          (Exhibit 43 was marked for

9          identification by the Reporter.)

10      MS. JACKSON:  Expert Witness Designation?

11  There is two of them.

12      MR. MOVIT:  The one that says, "Plaintiff Will

13  Loomis' Expert Witness Designation."

14      MS. JACKSON:  Yeah.  One is thick, and one is a

15  little bit thinner.

16      MR. MOVIT:  You have you two there, Kim, that

17  say, "Plaintiff Will Loomis' Expert Witness

18  Designation"?

19      MS. JACKSON:  Yeah.

20      MR. MOVIT:  Could you just -- could you hold

21  them up to the camera for me, please.

22      MS. JACKSON:  Here it is.

23      MR. MOVIT:  A little closer.  Okay, that's it.

24  And what is the other one?

25          No, those are the same document.  They

Page 9

1    should be the same thickness.

2          MS. JACKSON:  No, but I'll give him one of

3    these.

4          MR. MOVIT:  The thicker one, please.

5          MS. JACKSON:  Sure.

6          THE WITNESS:  Thank you.

7          MS. JACKSON:  I'll double-check the

8    attachments.

9          THE WITNESS:  This is multiple copies.

10         MR. MOVIT:  That's why it is thicker.

11         MS. JACKSON:  There is one PDF.  Well, I have

12   one copy here.

13         MR. MOVIT:  Could you -- let's try the other

14   copy.

15         MS. JACKSON:  I apologize.  I sent them to

16   imaging.

17         MR. PEASE:  This one is "Defendants' Expert"

18   the thicker one --

19         MR. MOVIT:  That's a different document.  Kim,

20   could you please take back the one that says

21   "Defendants."

22         MS. JACKSON:  Yeah, taking them back.

23         MR. PEASE:  Let me take a look at that one

24   first.  She has a sticker, so this is her copy.

25         THE WITNESS:  I have my own copy here.

1        MR. PEASE:  No, that goes -- that's attached.

2        THE WITNESS:  Okay.  All right.

3        MS. JACKSON:  I have no idea what happened to

4    that.  Apologies, Jeff.

5        MR. MOVIT:  That's okay.

6        MS. JACKSON:  I don't know what happened, but

7    they are set now with what you asked for.

8        MR. MOVIT:  Okay.

9        Q    So Exhibit No. 43 is in front of you,

10   Dr. Stern?

11       A    Yes.

12       Q    Okay.  Is this your expert report in this

13   action, Loomis v. Cornish?

14       A    Yes.

15       Q    Okay.  Dr. Stern, have you ever submitted

16   an expert report in any other litigation before?

17       A    Pretrial reports.

18       Q    Have you ever submitted pretrial report in

19   any litigation before?

20       A    Yes.

21       Q    Okay.  Was that once or more than one

22   time?

23       A    Twice.

24       Q    Okay.  Do you recall the name of the first

25   case?

1      A      It's a pretty big one.  Usher --

2    Straughter vs. Usher.  Something like Ernest

3    Straughter, S-t-r-a-u-g-h-t-e-r, et al. vs. Usher,

4    et al.

5      Q      And what was the other one, if you recall?

6      A      That one I have -- they never went to

7    trial, to my knowledge.  I told them not -- not to

8    pursue it, based on what I found.  That was my

9    advice.  The lawyer was Adam Aparicio.

10     Q      Okay.  Any other reports that you have

11   done pertaining to a lawsuit?

12     A      No, apart from the current one.

13     Q      Okay.  Dr. Stern, we're now going to mark

14   another exhibit.

15          Kim, this is called, internal to you,

16   Exhibit DDD?

17     MS. JACKSON:  Okay, I have that.  Just a

18   moment.

19     MR. MOVIT:  I'm sorry, yeah, that's correct,

20   DDD.

21     MS. JACKSON:  DDD.  This is Exhibit 44?

22     MR. MOVIT:  Yes.

23          (Exhibit 44 was marked for

24          identification by the Reporter.)

25   ///

Page 12

1       THE WITNESS:  Thank you.

2       MS. JACKSON:  Uh-huh.

3       MR. PEASE:  Just for the record --

4       MR. MOVIT:  Yes.

5       MR. PEASE:  -- I provided a four-disc one-page

6   document in an envelope, I provided it to Kim -- it

7   is Kim; correct?

8       MS. JACKSON:  Yes.

9       MR. PEASE:  And that has the four CDs, and that

10  is part of the -- referenced in the report.  So it

11  should be included as part of that I would imagine.

12      MR. MOVIT:  And Mr. Pease has represented that

13  the four sound recordings that he's just provided to

14  Kim are the sound recordings embodied in the

15  compositions that Dr. Stern has referred to as BRC

16  Original, BRC Final, Domino and Rush and no others.

17      MR. PEASE:  That's correct.

18      MR. MOVIT:  Okay.  Thank you.

19      Q    Dr. Stern, is Exhibit 44 in front of you

20  yet?

21      A    Yes.

22      Q    Okay, Dr. Stern, Exhibit 44 is a copy of

23  Exhibit D to your expert report in this case;

24  correct?

25      A    Correct.

Page 13

1      Q      Okay.  And Exhibit 44 contains

2   transcriptions; correct?

3      A      Correct.

4      Q      Okay.  Transcription of a composition that

5   you referred to as BRC Original, a composition that

6   you referred to as BRC Final and Domino; correct?

7      A      On here I didn't use "BRC."  I just said

8   Bright Red Chords.

9      Q      Okay.  On page 2 of this exhibit, and

10  thereafter you refer to them with those names.

11     A      Oh, yes, you're right, on the short

12  headings, thank you.

13     Q      Okay.  So the one that you have called BRC

14  Original, you have also called "Bright Red Chords

15  Loomis and the Lust copyright version done at Record

16  Plant Original key D major"; is that correct, sir?

17     A      That is correct.

18     Q      Okay.  And is it your understanding that

19  that is the version of Bright Red Chords that Will

20  Loomis deposited at the Copyright Office?

21     A      That is my understanding.

22     Q      Okay.  The second version which you have

23  called both "BRC Final and Bright Red Chords, Loomis

24  and the Lust video version original key D major,"

25  can you please explain what you understand this

Page 14

1    composition to be.

2        A    The final released version.

3        Q    Okay.  What do you mean by "video

4    version," sir?

5        A    There is a video.  They did a video of

6    this song.  It's the version of the song on the

7    video.

8        Q    Okay.

9        A    It's a more polished recording.

10        Q    Where did you see this video?

11        A    On YouTube.

12        Q    Okay.  And the third composition that you

13    have transcribed here is Jessie J -- I'm sorry,

14    strike that.  "Domino, Jessie J, original key G

15    major, transposed to D major for comparison with

16    BRC."

17            Dr. Stern, where did you get the sound

18    recording that you have transcribed as Domino?

19        A    I used the video version on YouTube also.

20        Q    Okay, thank you.

21            Dr. Stern, I'd like you to please turn to

22    the second page of your -- of this exhibit here,

23    Exhibit 44, and will you please look, sir, at the

24    BRC Final transcription on this page.

25        A    Yes.

Page 15

1      Q    Okay.  And my question, sir, is commencing

2   with measure 10 and extending to measure 17, two

3   pages later -- my question is going to concern those

4   measures.

5      A    All right.

6      Q    Dr. Stern, is it your opinion that

7   measures 10 through 17 of BRC Final contain all of

8   the material in Bright Red Chords, leaving aside

9   repeated material that you contend was copied by

10  Domino?

11     A    It certainly has the core material.  It

12  has Figure A and the ending of Figure B there.  So

13  those are the ones that I'm saying on musical

14  grounds are common to both pieces.

15     Q    So is it fair to say that what your --

16  one, it's your opinion that it is common musically

17  to both pieces, is entirely embodied in measures 10

18  through 17, understanding that it may be repeated

19  elsewhere, but it is all embodied in those measures?

20     A    I think so.  Let me just take a quick

21  look.

22     Q    Sure, of course.

23     A    Yes, I would agree to that.

24     Q    So, Dr. Stern, would you similarly agree

25  that measures 9 through 17 in your transcription of

1    BRC Original contain all of the material in BRC

2    Original, leaving aside material that is repeated,

3    that you contend was copied by Domino?

4         A    I am not sure I quite got the question.

5    If you're saying --

6         Q    Sure.  I'm asking my question before about

7    measures 10 through 17 of BRC Final.

8         A    Right.

9         Q    And now I'm just asking the same question

10   about measures 9 through 16 of BRC Original.

11        A    Yes, all of the relevant material was

12   there in the Original copyright version.

13        Q    Uh-huh, in measures 9 through 16?

14        A    Absolutely.

15        Q    Okay.  Thank you, sir.

16             Do you have a pen there, Dr. Stern?

17        A    I do now.

18        Q    Okay.  I would ask you, sir, to please

19   write on Exhibit D -- I'm sorry, your Exhibit D,

20   which is Exhibit 44, for purposes of this

21   litigation --

22        A    Yes.

23        Q    -- I would ask you to please write, for

24   measures 10 through 17 of BRC Final, and the

25   equivalent measures for the other two compositions

1  that you have transcribed here, if you would please

2  write for each note the interval -- strike that.

3  Strike that.

4         If you would please write the scale

5  degree, the note, the name of the note, and the

6  rhythmic value for measures 10 through 17 and the

7  equivalent measures in the other two compositions

8  that you have transcribed.

9     MR. PEASE:  I'm going to object just to the

10 form of the question, and the fact that it starts on

11 9.  There is an overlapping bracket, but aren't we

12 going from 9 to 17?

13    MR. MOVIT:  We're going from 10 -- so the

14 record is clear, we're going from 10 through 17 of

15 BRC Final.  We're going from 9 through 16 of BRC

16 Original, and we're going from 4 to 11 of Domino.

17    MR. PEASE:  Thank you.

18    THE WITNESS:  You want the entire verses done

19 this way?

20 BY MR. MOVIT:

21    Q   Just measures 10 through 17 of BRC Final,

22 measures 9 through 16 of BRC Original and measures 4

23 through 11 of Domino, please.

24    A   (Witness complies.)

25        Jeff?

Page 18

1      Q     Yes, Dr. Stern?

2      A     You wanted the durations, the note names,

3    the scales degrees.  Was there another question in

4    there?

5      Q     If by "duration" you mean the rhythmic

6    value, then yeah --

7      A     Durations, yeah, 8th notes, dotted

8    quarters, whatever.

9      Q     Yes, that's fine, Dr. Stern, yes.

10      A     Okay.  What I did is I used kind of a

11    code.  I just put "E," and then sometimes I just

12    wrote a line, so I didn't have to write out every

13    single one.  So you just know that whole row is a

14    bunch of 8th notes.

15      MR. MOVIT:  Okay, so what we'd like to do now

16    is take a break.

17           Kim is going to send me this document by

18    PDF to New York, so I can ask questions about it.

19    It will a very short break.

20      THE WITNESS:  Fine.  Thank you.

21      MS. JACKSON:  Off the video 1:38.

22           (A recess was taken from

23           1:38 p.m. to 1:59 p.m.)

24      THE VIDEOGRAPHER:  Back on the video record,

25    2:00.

Page 19

1      MR. MOVIT:  Back on the record.

2      Q    Dr. Stern, do you have Exhibit 44 in front

3   of you?

4      A    Yes.

5      Q    Okay.  If you would please turn to

6   the second page.

7      A    Yes.

8      Q    Okay, for measure 9, Dr. Stern, in BRC

9   Original --

10     A    Yes.

11     Q    -- could you please read into the record

12   the scale degrees in that measure.

13     A    Sure.  6 1 6 1 6 1 1 3.

14     Q    Oh, I just said measure 9, sir.  There is

15   no 3 in measure 9; correct?

16     A    I'm sorry, I finished out the phrase.  I

17   went into measure --

18     Q    Okay.  Just for a clear record, then, sir,

19   could you please -- I'm going to just ask the

20   question again.  If you could read the scale degrees

21   in measure 9 of BRC Original --

22     A    No problem.

23          6 1 6 1 6 1 1.

24     Q    And those are the same scale degrees in

25   measure 10 of BRC Final; correct?

1    A    Correct.

2    Q    And, Dr. Stern, that would be an

3 oscillation between 6 and 1; correct?

4    A    Correct.

5    Q    Dr. Stern, is it fair to stay that an

6 oscillation between 6 and 1 is not anything that a

7 single composer is entitled to monopolize?

8    A    When you're talking about just going back

9 and forth between any two scale degrees, of course

10 not.  Melodic identity comes about through certain

11 patterns of those scale degrees.

12    Q    So the answer to my question, then, would

13 be "yes"?

14    A    Yes.

15    Q    Dr. Stern, if you can please read out the

16 rhythmic values in just measure 9 of BRC Original,

17 please.

18    A    All 8th notes.

19    Q    Okay.  And measure 10 of BRC Final has the

20 identical rhythmic values; correct?

21    A    Correct.

22    Q    Is it fair to say, Dr. Stern that the use

23 of all 8th notes is not something that any single

24 composer is entitled to monopolize?

25    A    Yes.

1          Q     Dr. Stern, if you would please look at

2     measure 10 of BRC Original.

3          A     Yes.

4          Q     If you could please read out the scale

5     degree in measure 10 of BRC Original.

6          A     It's 3.  And the notes should read F

7     sharp.

8          Q     So just so we have a clear record,

9     Dr. Stern, can you just read out the notes in

10    measure 9 as well of BRC Original.

11         A     Certainly.

12               B D B D B D D F sharp.

13         Q     Dr. Stern, I said just measure 9.

14         A     B --

15         Q     There is no F sharp in measure 9; correct?

16         A     Right.  I'll have to get use to segmenting

17    the idea.

18         Q     So if you could please, just so we have a

19    clear record, sir, if you could please just read out

20    the notes in just measure 9, please.

21         A     B D B D B D D.

22         Q     Okay, thank you, sir.

23               And, Dr. Stern, can you please let us know

24    the rhythmic value of the F sharp in measure 10 of

25    BRC Original.